# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No. 15-cv-02727-NYW

The ESTATE OF TIMOTHY SCOTT DIXON,
S.A.D., minor child, by and through his guardian and next friend Starla LeRoux, and
CODY DIXON,

      Plaintiffs,

v.

BOARD OF COUNTY COMMISSIONERS OF CROWLEY COUNTY,
CROWLEY COUNTY COLORADO SHERIFFS OFFICE,
MILES CLARK, in his individual capacity,
MARK MORLOCK, in his individual capacity,
JAMES BUTLER, in his individual capacity, and
ALACIA JACOBS, in her individual capacity,

      Defendants.

---

## MEMORANDUM OPINION AND ORDER

---

Magistrate Judge Nina Y. Wang

      This matter comes before the court on two related motions:

      (1)     Defendants Board of County Commissioners of Crowley County ("County"), Crowley County Sheriff's Office ("CCSO"), and Mark Morlock's (collectively, "County Defendants") Motion and Brief in Support of Summary Judgment (the "Motion for Summary Judgment") [#114,[1] filed Jan. 19, 2017]; and

---

[1] Where the court refers to the filings made in Electronic Court Filing ("ECF") system in this action, it uses the convention [#___] and uses the page number as assigned by the ECF system, except when citing from the transcript of a deposition. When citing the transcript of deposition, the court uses the ECF docket number, but cites to the page and line numbers as assigned in the original transcript.

(2)     Defendants Miles Clark, James Butler, and Alacia Jacobs' (collectively, "Individual Defendants") Motion for Summary Judgment [#116, filed Jan. 19, 2017].

The Motions for Summary Judgment are before the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(c) and the Order of Reference dated March 11, 2016 [#62]. The court concludes that oral argument will not materially assist in the resolution of this matter. Accordingly, after carefully considering the motions and associated briefing, the entire case file, the applicable case law, the Motions for Summary Judgment are GRANTED IN PART AND DENIED IN PART for the reasons set forth below.

## PROCEDURAL HISTORY

The court has discussed in detail this action's procedural history in previous rulings, *see, e.g.*, [#107], and discusses it here only as it pertains to the pending motions. On December 16, 2015, The Estate of Timothy Scott Dixon, S.A.D., a minor child, and Cody N. Dixon (collectively, "Plaintiffs") filed their initial Complaint in this matter. [#1]. Then, on March 11, 2016, the court granted Plaintiffs' First Motion to Amend their Complaint, *see* [#63], and Plaintiffs' First Amended Complaint ("FAC") became the operative complaint in this matter. *See* [#67]. The FAC alleged the following claims pursuant to 42 U.S.C. § 1983: (1) Unlawful Arrest and Seizure against Defendants Clark, Morlock, and Butler ("Claim I"); (2) Failure to Provide Medical Care and Treatment against all Defendants ("Claim II"); (3) *Monell* Liability against Defendants County and CCSO ("Claim III"); (4) *Monell* Liability for Failure to Train and Supervise against Defendants County and CCSO ("Claim IV"); and (5) Supervisory Liability for Failure to Train and Supervise against Defendants Clark and Morlock ("Claim V"). [*Id.*]. In addition, the FAC alleged two state law claims against all Defendants pursuant to Colo. Rev.

Stat. § 13-21-202 for (6) Wrongful Death by Negligent Supervision ("Claim VI") and (7) Wrongful Death by Negligence ("Claim VII").  [*Id.*].

On April 5, 2016, Defendants Butler, Jacobs, and Clark each filed their own Motion to Dismiss, seeking dismissal of all claims against them for failure to state a claim or on qualified immunity grounds.  *See* [#72; #73; #75].  Then, on April 25, 2016, the County Defendants filed a Partial Motion to Dismiss Claim I (Unlawful Arrest and Seizure) for failure to state a claim and because Defendant Morlock was entitled to qualified immunity.  [#84].  The court held a Motions Hearing and took the four Motions to Dismiss under advisement.  *See* [#99].  On November 15, 2016, the court issued an order dismissing without prejudice Claim I (Unlawful Arrest and Seizure), Claim II (Failure to Provide Medical Care) as to Defendant Jacobs only, Claim V (Supervisory Liability – Failure to Train) as to Defendant Clark only, and Claim VI (Wrongful Death by Negligent Supervision) as to Defendant Clark only.  *See* [#107].  Thus, the remaining claims are Claim II (Failure to Provide Medical Care) against Defendants Morlock, Clark, and Butler; Claim III (*Monell* liability – Failure to Provide Medical Care); Claim IV (*Monell* liability – Failure to Train/Supervise); Claim V (Supervisory Liability – Failure to Train) against Defendant Morlock; Claim VI (Wrongful Death – Negligent Supervision) against the County Defendants and Defendants Butler and Jacobs; and Claim VII (Wrongful Death – Negligence).

On January 19, 2017, the County Defendants and Individual Defendants (collectively, "Defendants") filed their respective Motions for Summary Judgment.  *See* [#114; #116].  Plaintiffs filed a joint response [#123], and Defendants each filed a reply [#131; #132].  On March 7, 2017, the undersigned held a Final Pretrial Conference at which the court set the matter

for a seven-day jury trial to begin on September 25, 2017. [#127]. The motions being ripe for resolution, the court considers the Parties' arguments below.[2]

## MATERIAL FACTS

Timothy Scott Dixon ("Mr. Dixon") passed away at the age of forty-four on January 31, 2014, while in the custody of the CCSO. *See* [#123 at Statement of Facts ("SOF") ¶ 1]. The following facts, leading up to Mr. Dixon's death, are undisputed unless otherwise noted.

### Employment in Nebraska and JR's Country Store and Restaurant

On the morning of January 31, 2014, Mr. Dixon left his temporary employment position in Nebraska because he was feeling ill, and began his drive home to Pueblo, Colorado. [*Id.* at SOF ¶¶ 2, 3; #123-10 at 73:17–19; #123-13 at 3, 25–26]. Unbeknownst to him, Mr. Dixon suffered from a serious medical condition called bacterial pneumonia that affected his physical and mental functioning. *See generally* [*id.* at SOF ¶¶ 4; #123-14 at ¶ 5]. Because of his illness, Mr. Dixon defecated in his pants, vomited, and experienced respiratory issues. [#123 at SOF ¶¶ 4–5].

While in Ordway, Colorado, Mr. Dixon stopped for gas at JR's Country Store and Restaurant ("JR's"). [*Id.* at SOF ¶ 6]. Upon entering JR's premises, Mr. Dixon crashed his car into concrete blocks at the end of the parking lot and had difficulty pulling up to the gas pump. [*Id.* at SOF ¶ 7]. A witness, Donald Ferritto, observed Mr. Dixon struggling to stand and pump his gas. [*Id.*; #114 at Statement of Undisputed Material Facts ("SOUMF") ¶ 1]. Because of this, Mr. Dixon entered JR's convenient store to request help with pumping his gas; however, while

---

[2] Oral argument on the Motions for Summary Judgment is currently scheduled to occur on April 25, 2017. However, based on the court's consideration of the briefing and applicable case law, this court finds that oral argument would not materially assist in the disposition of the matter due to Plaintiffs' failure to address whether the alleged constitutional violation is clearly established in their briefing.

seeking assistance, Mr. Dixon fell backwards into a food shelf. [#123 at SOF ¶ 7]. Eventually, a JR's employee assisted Mr. Dixon with pumping his gas. [*Id.*]. Soon thereafter, Mr. Ferritto placed an anonymous call to the CCSO to report that a JR's patron (Mr. Dixon) had crashed his car into concrete barriers at JR's, had difficulty standing and pumping his gas, and who had exited JR's traveling east on County Road G. [*Id.* at SOF ¶ 8; #114 at SOUMF ¶ 1; #116 at Statement of Facts ("SOF") ¶ 1].

### Traffic Stop, Field Sobriety Test, and Arrest

Defendant Morlock, responding to Mr. Ferritto's report, observed Mr. Dixon's vehicle travelling at a slow rate of speed on Road G, and stopped Mr. Dixon's vehicle after Mr. Dixon had twice drifted off the road. [#114 at SOUMF ¶¶ 2–3; #116 at SOF ¶ 2; #123 at SOF ¶ 9]. Upon approaching Mr. Dixon's vehicle, Defendant Morlock observed Mr. Dixon smoking a cigarette (that he later disposed of), asked Mr. Dixon for his driver's information, and asked Mr. Dixon where he was going. [#114 at SOUMF ¶¶ 4–5; #116 at SOF ¶ 2; #123 at SOF ¶ 10]. Mr. Dixon responded that he was on his way to Pueblo (the opposite direction from where Defendant Morlock stopped him), and that he was sick and had defecated in his pants.[3] [#114 at SOUMF ¶ 2, 6; #116 at SOF ¶¶ 2–3; #123 at SOF ¶ 13]. Defendant Morlock observed that Mr. Dixon was confused, that his eyes were watery and bloodshot, that his speech was slurred, that a "strong smell of alcohol" emanated from Mr. Dixon's person, and that Mr. Dixon admitted to consuming beer. [#114 at SOUMF ¶¶ 5–7; #116 at SOF ¶ 4; #123 at SOF ¶¶ 11–12; #123-12 at 81:19–21]. Plaintiffs dispute that Mr. Dixon admitted to drinking beer, as his toxicology reports were negative for alcohol. *See* [#123 at SOF ¶¶ 12, 22]. Suspecting Mr. Dixon of driving under the

---

[3] Even construing the facts in a light most favorable to Plaintiffs, the record indicates that Mr. Dixon did not inform Defendant Morlock that he was also on his way to see a doctor in Pueblo. *Compare* [#123 at SOF ¶ 13] *with* [#123-12 at 83:5–9 (Defendant Morlock testifying that he does not recall Mr. Dixon stating that he was on his way to see a doctor in Pueblo)].

influence, Defendant Morlock requested that Defendant Butler, certified in Standard Field Sobriety Training ("SFST"), administer a field sobriety test. [#114 at SOUMF ¶ 9; #116 at SOF ¶ 5; #123 at SOF ¶ 14].

At approximately 3:03 p.m., Defendant Clark arrived at the scene. [#116 at SOF ¶ 5; #123 at SOF ¶ 14]. Defendant Morlock informed Defendant Clark of his general observations of Mr. Dixon, and Mr. Dixon informed Defendant Clark that he was sick and heading home to Pueblo for this reason. [#116 at SOF ¶¶ 6–7; #123 at SOF ¶ 14]. Defendant Clark observed that Mr. Dixon "appeared like he had the flu or a bad cold. He was congested." [#123 at SOF ¶ 14; #123-4 at 51:10–19].

Defendant Butler arrived at the scene at approximately 3:16 p.m. [#116 at SOF ¶ 8; #123 at SOF ¶ 16]. Prior to turning over the investigation to Defendant Butler and leaving the scene, Defendant Morlock provided Defendant Butler with all of his observations and relevant information regarding Mr. Dixon, including that he was sick and had defecated in his paints— Defendant Butler does not recall having this conversation. [#114 at SOUMF ¶¶ 9–10; #116 at SOF ¶ 8; #123 at SOF ¶ 17; #123-12 at 90:1–11, 92:11–15, 95:1–7, 101:23–102:3]. Defendant Butler then administered three field sobriety tests—the horizontal gaze nystagmus, walk and turn, and one-leg stand; however, Mr. Dixon was unable to complete any of these tests. [#116 at SOF ¶¶ 9, 11; #123 at SOF ¶ 19]. In fact, Defendant Butler ceased the walk and turn and one-leg stand tests for safety reasons, as Mr. Dixon was unstable and, at one point, Defendants Clark and Butler had to stabilize Mr. Dixon. [#123 at SOF ¶ 19; #123-3 at 18:5–18, 20:3–8]. Then, Defendant Butler requested that Mr. Dixon submit to a preliminary breathalyzer test and Mr. Dixon complied; however, he was also unable to perform this test properly. [#116 at SOF ¶ 12; #123 at SOF ¶ 19]. At this point, Defendant Butler allegedly noticed an odor of alcohol

emanating from Mr. Dixon's person, believed Mr. Dixon to be highly intoxicated, and was allegedly informed by Mr. Dixon that he had consumed six sixteen-ounce beers that day. *See* [#116 at SOF ¶¶ 11–12; #123 at SOF ¶¶ 19, 21, 25; #123-3 at 84:7–9]. Again, Plaintiffs dispute that Mr. Dixon admitted to consuming alcohol the day of the traffic stop. [#123 at SOF ¶¶ 21, 22]. Subsequently, Defendant Butler placed Mr. Dixon under arrest for driving under the influence of alcohol. [#114 at SOUMF ¶ 12; #116 at SOF ¶ 13; #123 at SOF ¶ 20].

<u>Search of Mr. Dixon's Car and Blood Draw</u>

Following his arrest, Defendant Clark informed Mr. Dixon of Colorado's Express Consent law, and Mr. Dixon opted for a blood draw at Arkansas Valley Regional Medical Center ("AVRMC"). [#114 at SOUMF ¶ 13; #116 at SOF ¶ 19; #123 at SOF ¶ 27]. However, while handcuffed in the backseat of Defendant Butler's vehicle, Defendant Clark asked Mr. Dixon if he needed any personal items or medications from his vehicle. [#116 at SOF ¶ 14]. Mr. Dixon requested a specific bag from his car, but no medications; however, Defendant Clark, with Mr. Dixon's assistance, was unable to locate the bag. *See* [*id.*; #123-4 at 49:4–50:1]. Though not entirely clear, Defendants Butler and Clark both allege that they discovered an unopened six-pack of beer in Mr. Dixon's car. *See* [#116 at SOF ¶ 15; #123 at ¶ 21]; *see also* [#116-3 at 61:9–62:23 (Defendant Clark testifying that he saw the beer, but "never handled it at any time."); #123-3 at 40:8–11, 42:3–5 (Defendant Butler testifying that Defendant Clark collected the six-pack of beer, but not recalling what happened after that)]. Plaintiffs dispute that Defendants Clark and Butler found beer in Mr. Dixon's car, as it was not reported as inventory until March 2014. [#123 at SOF ¶¶ 21–22].[4]

---

[4] In a footnote, Plaintiffs appear to move for spoliation sanctions against Defendants, arguing that Defendants destroyed the beer despite Plaintiffs' request that they preserve all evidence recovered the day of the traffic stop. *See* [#123 at 14 n.6]. However, Plaintiffs cannot move for

At approximately 3:52 p.m., Defendant Clark left the scene and went off-duty. [#116 at SOF ¶ 20]. Around this same time, Defendant Butler transported Mr. Dixon to AVRMC in La Junta, Colorado for the sole purpose of conducting a blood draw to test Mr. Dixon's blood for alcohol and controlled substances—the two arrived at AVRMC at approximately 4:19 p.m. [#114 at SOUMF ¶ 15; #116 at SOF ¶ 19; #123 at SOF ¶¶ 12, 27]. It is undisputed that at some point during the drive to AVRMC, Mr. Dixon asked Defendant Butler to roll down the back window, because Mr. Dixon stated that he was "burning up." [#116 at SOF ¶ 21; #123 at SOF ¶ 27]. However, the Parties dispute whether Mr. Dixon's overheating was the result of his attire (coat, boots, and hat) or his illness. *Compare* [#116 at SOF ¶¶ 21–22] *with* [#123 at ¶ 27]. A phlebotomist completed Mr. Dixon's blood draw at approximately 4:49 p.m. [#114 at SOUMF ¶ 15; #116 at SOF ¶ 23; #123 at SOF ¶ 29]. At no time between the traffic stop and the completion of the blood draw did Mr. Dixon request medical attention, nor did Defendants Morlock, Clark, or Butler seek medical evaluation of Mr. Dixon. [#114 at SOUMF ¶ 16; #116 at SOF ¶ 23; #123 at SOF ¶ 29].

<u>The Booking Process</u>

Following the blood draw, Defendant Butler transported Mr. Dixon to the Crowley County Jail (the "jail") for booking. [#114 at SOUMF ¶ 17; #116 at SOF ¶ 25; #123 at SOF ¶ 29]. Prior to their arrival, Defendant Jacobs (a relatively new employee) began her shift as one of two jail dispatchers/booking deputies on duty the evening of January 31, 2014. [#114 at SOUMF ¶ 18; #116 at SOF ¶ 24; #123 at SOF ¶ 30]. Defendant Jacobs' supervisor, Richelle Atchison, informed Defendant Jacobs that she would need to book an adult male who Defendant Butler arrested for driving under the influence and who was being transported from the AVRMC.

---

sanctions in their response, *see* D.C.COLO.LCivR 7.1(d), and never moved for sanctions prior to the close of discovery.

[#116 at SOF ¶ 24; #123 at SOF ¶ 30].  Both Defendant Jacobs and Ms. Atchison believed that Mr. Dixon was being medically cleared prior to his booking.  [#116 at SOF ¶ 24; #123 at SOF ¶ 30].

About 5:19 p.m.,[5] Defendant Jacobs received a phone call from Defendant Morlock wherein Defendant Morlock advised Defendant Jacobs that Mr. Dixon needed to be "locked down," *i.e.*, isolated from other inmates or jail staff, because he possibly had "bronchitis or pneumonia."  [#114 at SOUMF ¶¶ 25–26; #116 at SOF ¶ 34; #123 at SOF ¶ 31].  Defendant Morlock then consulted with Defendant Clark regarding Mr. Dixon's isolation, and Defendant Clark decided that Mr. Dixon did not need to be "locked down" but, rather, Mr. Dixon should be placed in a single-cell to limit exposure to other inmates.  [#114 at SOUMF ¶ 29; #116 at SOF ¶ 35; #123 at SOF ¶ 31; #123-4 at 79:15–80:20 (Defendant Clark testifying that he wanted to limit Mr. Dixon's exposure to other inmates because he knew Mr. Dixon was "ill and wasn't feeling good," but stating he would not take such measures if an inmate had "a common cold")].  Defendant Morlock then informed Defendant Jacobs of Defendant Clark's directive, and Defendant Jacobs and Ms. Atchison assigned Mr. Dixon to Cell 3 because it had video surveillance.  [#114 at SOUMF ¶ 30; #116 at SOF ¶¶ 34, 36; #123 at SOF ¶ 31; #123-1 at 43:11–18 (Ms. Atchison testifying that, because Defendant Morlock stated that Mr. Dixon was sick, they thought, 'Maybe we need to keep an eye on him.'")].

Around 5:29 p.m., Defendant Butler and Mr. Dixon arrived at the jail.  [#116 at SOF ¶ 25; #123 at SOF ¶ 32].  At some point, Defendant Butler allegedly asked Mr. Dixon if he needed medical assistance to which Mr. Dixon responded "no."  [#114 at SOUMF ¶ 20; #114-5 at 186:20–187:20; #116 at SOF ¶ 31].  However, prior to formal booking procedures, Defendant

---

[5] Though unclear as to when these phone calls occurred, viewing the facts in a light most favorable to Plaintiffs, the court uses the time alleged in Plaintiffs' response.

Butler instructed Mr. Dixon to take a shower given that he had defecated in his pants. [#116 at SOF ¶ 25; #123 at SOF ¶ 32]. Deputy Jon Miller and Defendant Butler assisted Mr. Dixon with showering. [#116 at SOF ¶ 26; #123 at SOF ¶ 32]. Based on his interaction with Mr. Dixon, Deputy Miller believed that Mr. Dixon had "crackling lungs," commonly associated with chronic obstructive pulmonary disease ("COPD") or pneumonia. [#114 at SOF ¶ 26; #116 at SOF ¶ 26; #123 at SOF ¶ 34]. Deputy Miller asked Mr. Dixon if he had either, and Mr. Dixon responded that he did not know and was on his way to see a doctor at the time Defendant Morlock stopped him. [#123 at SOF ¶ 34]. Deputy Miller did not smell alcohol on Mr. Dixon's person. [*Id.*]. Deputy Miller allegedly informed both Defendants Morlock and Butler of his observations and Mr. Dixon's answer; however, Defendant Butler testified that, while in the same room, he did not hear the conversation between Deputy Miller and Defendant Morlock. [#116 at SOF ¶¶ 26, 28; #123 at SOF ¶ 34]. Deputy Miller asked Defendant Morlock whether Mr. Dixon needed to be taken to the hospital, and Defendant Morlock responded that Mr. Dixon had already received a blood draw at AVRMC and if Mr. Dixon was not requesting medical attention, they should proceed with his booking. [#114 at SOUMF ¶¶ 27–28; #116 at SOF ¶ 26; #123 at SOF ¶ 34].

After his shower, Defendant Butler noticed that Mr. Dixon was "breathing like he had saliva in his throat and his throat needed to be cleared." [#116 at SOF ¶ 30; #123 at SOF ¶ 35; #123-13 at 29]. Defendant Butler then asked Mr. Dixon if he "always breathed like that," to which Mr. Dixon responded, "No, it just started a couple of weeks ago." [#123 at SOF ¶ 35; #123-13 at 29].

At approximately 6:48 p.m., Defendant Jacobs booked Mr. Dixon into the jail. [#123 at SOF ¶ 36]. Pursuant to jail policies, Defendant Jacobs was required to (1) ask Mr. Dixon several screening questions, including whether Mr. Dixon needed medical assistance, and (2) determine

independently whether Mr. Dixon needed medical evaluation due to being injured, ill, not fully conscious, or highly intoxicated. [#114 at SOUMF ¶¶ 21–22, 24; #116 at SOF ¶¶ 32–33; #123 at SOF ¶ 36]. It is undisputed that Defendant Jacobs determined that Mr. Dixon did not need medical evaluation. [#116 at SOF ¶ 24; #123 at SOF ¶ 30]. However, Defendant Jacobs did observe Mr. Dixon clearing his throat on several occasions during the booking process and Ms. Atchison observed Mr. Dixon coughing during the booking process, but neither detected an odor of alcohol on Mr. Dixon's person. [#123 at SOF ¶ 36].

Defendants also assert that Defendant Jacobs followed jail policy by asking Mr. Dixon whether he required medical assistance, to which Mr. Dixon stated that he did not. However, Plaintiffs contend that jail policy required Defendant Jacobs to document Mr. Dixon's answers to several screening questions, but that no completed screening forms were included in his booking file; thus, it is uncertain whether Defendant Jacobs followed jail protocol. *Compare* [#114 at SOUMF ¶¶ 21–22; #116 at SOF ¶¶ 32–33] *with* [#123 at SOF ¶¶ 36, 40–45]. It is undisputed, however, that even if Mr. Dixon denied the need for medical assistance, he never signed the required medical waiver form. [#114 at SOUMF ¶ 24; #123 at SOF ¶ 42]. Plaintiffs also argue that at no point was Mr. Dixon offered a phone call, another violation of jail policy. [#123 at SOF ¶ 37].

<u>Post-Booking Events and Mr. Dixon's Passing</u>

As mentioned, Defendants assigned Mr. Dixon to a single-cell with video surveillance (Cell 3) following his booking. [#114 at SOUMF ¶ 34; #116 at SOF ¶ 37; #123 at SOF ¶ 38]. Mr. Dixon had access to the common room and interacted with two other detainees at the jail. [#114 at SOUMF ¶ 37; #116 at SOF ¶ 37; #123 at SOF ¶ 46]. These detainees indicated that Mr. Dixon had the "shakes real bad," but they did not believe him to be drunk. [#123 at SOF ¶ 46].

Not soon after, Mr. Dixon went into his cell to lie down. [#114 at SOUMF ¶ 39]. Then, at approximately 9:06 p.m., after observing Mr. Dixon "thrashing around on his bed trying to 'catch air,' hitting his head, and kicking his legs," a detainee "buzzed" Ms. Atchison and informed her that Mr. Dixon was not breathing well and "was turning purple." [#114 at SOUMF ¶ 41; #116 at SOF ¶ 39; #123 at SOF ¶¶ 46–47]. Deputy Jon Hernandez responded to Mr. Dixon's cell, found him unconscious and struggling to breathe, and directed Ms. Atchison to call for medical assistance. [#114 at SOUMF ¶¶ 42–43; #116 at SOF ¶ 40; #123 at SOF ¶ 47]. Ms. Atchison summoned EMT Christine Beckett who arrived at the jail roughly five minutes later. [#114 at SOUMF ¶ 44; #116 at SOF ¶ 42; #123 at SOF ¶ 48].

Upon her arrival, Deputy Miller informed EMT Beckett that Mr. Dixon had pneumonia. [#123 at SOF ¶ 48; #123-2 at 36:21–37:3]. EMT Beckett entered Mr. Dixon's cell and checked Mr. Dixon's pulse and lungs; she did not find a pulse and Mr. Dixon was not breathing. [#114 at SOUMF ¶ 45; #116 at SOF ¶ 43; #123 at SOF ¶ 48]. Nonetheless, EMT Beckett administered compression-only CPR, but to no avail; EMT Beckett also testified that no one at the jail informed her of the jail's portable defibrillator, which she would have used "first off." *See* [#114 at SOUMF ¶¶ 45–46; #116 at SOF ¶ 44; #123 at SOF ¶¶ 48–50].

At approximately 9:59 p.m. on January 31, 2014, Crowley County Deputy Coroner Gary Gibson pronounced Mr. Dixon's time of death. [#116 at SOF ¶ 44; #123 at SOF ¶ 52]. Robert C. Bux, M.D., conducted an autopsy on February 3, 2014, and determined that Mr. Dixon's cause of death was bacterial pneumonia. [#123 at SOF ¶ 53]. Subsequent blood analyses performed by ChemaTox Laboratory, Inc. reported no traces of alcohol or illegal controlled substances in Mr. Dixon's blood samples drawn on the night of his death. [*Id.* at ¶ 54]. At no

time prior to Mr. Dixon's death did any Defendants or jail personnel seek medical assistance for Mr. Dixon.

## STANDARD OF REVIEW

### I.    Rule 56 Generally

Summary judgment is appropriate only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Henderson v. Inter-Chem Coal Co.*, 41 F.3d 567, 569 (10th Cir. 1994). Whether there is a genuine dispute as to a material fact depends upon whether the evidence presents a sufficient disagreement to require submission to a jury or conversely, is so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986); *Carey v. U.S. Postal Serv.*, 812 F.2d 621, 623 (10th Cir. 1987). A fact is "material" if it pertains to an element of a claim or defense; a factual dispute is "genuine" if the evidence is so contradictory that if the matter went to trial, a reasonable party could return a verdict for either party. *Anderson*, 477 U.S. at 248. "A 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Tolan v. Cotton*, 134 S.Ct. 1861, 1866 (2014).

If the moving party demonstrates an absence of evidence supporting an essential element of the opposing party's claims, the burden shifts to the opposing party to show that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324. To satisfy this burden, the nonmovant must point to specific facts in an affidavit, deposition, answers to interrogatories, admissions, or other similar admissible evidence demonstrating the need for a trial. *Id.*; *Mares v. ConAgra Poultry Co.*, 971 F.2d 492, 494 (10th Cir. 1992). "[A] mere 'scintilla' of evidence will be insufficient to

defeat a properly supported motion for summary judgment; instead, the nonmoving party must introduce some 'significant probative evidence tending to support the complaint.'" *Fazio v. City & County of San Francisco*, 125 F.3d 1328, 1331 (9th Cir. 1997) (quoting *Anderson,* 477 U.S. at 249, 252). In reviewing a motion for summary judgment the court views all evidence in the light most favorable to the non-moving party. *See Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002).

## II.    Qualified Immunity

The doctrine of qualified immunity applies to government officials in their individual, as opposed to official, capacity, and does not attach to government entities. *See Beedle v. Wilson*, 422 F.3d 1059, 1069 (10th Cir. 2005). Accordingly, the doctrine "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Clark v. Wilson*, 625 F.3d 686, 690 (10th Cir. 2015) (quoting *Pearson v. Callahan*, 555 U.S. 223 (2009)).

In § 1983 cases, when a defendant moves for summary judgment on the basis of qualified immunity, the plaintiff must do more than simply identify a genuine dispute of material fact. Once an individual defendant asserts qualified immunity, Plaintiffs must demonstrate that the Individual Defendants, including Defendant Morlock, violated Mr. Dixon's constitutional rights and that those rights were clearly established.[6] *See Cox v. Glanz*, 800 F.3d 1231, 1246 (10th Cir. 2015). And, "although we review the evidence in the light most favorable to the nonmoving party, the record must clearly demonstrate the plaintiff[s] ha[ve] satisfied [their] heavy two-part burden." *Felder ex rel. Smedley v. Malcom*, 755 F.3d 870, 877–78 (10th Cir. 2014) (internal quotations and citation omitted).

---

[6] Courts have discretion to consider either prong first. *See Panagoulakos v. Yazzie*, 741 F.3d 1126, 1129 (10th Cir. 2013).

**ANALYSIS**

I.     **Section 1983 Claims**

Title 42 U.S.C. § 1983 allows an injured person to seek damages for the violation of her federal rights against a person acting under color of state law. *See* 42 U.S.C. § 1983; *see also West v. Atkins,* 487 U.S. 42, 48 (1988). To assert a claim under section 1983, Plaintiffs must show (1) that Mr. Dixon had a right secured by the Constitution and laws of the United States that was violated (2) by a person who acted under color of state law. *Hall v. Witteman,* 584 F.3d 859, 864 (10th Cir. 2009). "Like the state-action requirement of the Fourteenth Amendment, the under-color-of-state-law element of § 1983 excludes from its reach merely private conduct, no matter how discriminatory or wrongful." *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 757 F.3d 1125, 1143 (10th Cir. 2014) (quotations and citation omitted).

Further, a municipality cannot be liable under § 1983 for constitutional violations when there is no underlying constitutional violation by any of its officers, nor can it be held liable under the theory of vicarious liability for the constitutional deprivations of its officers. *See Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1317–18 (10th Cir. 2002). "Rather, to establish municipal liability, a plaintiff must show (1) the existence of a municipal policy or custom, and (2) that there is a direct causal link between the policy or custom and the injury alleged." *Hinton v. City of Elwood*, 997 F.2d 774, 782 (10th Cir. 1993).

With these standards in mind, this court now turns to the surviving claims.

A.     **Claim II - Failure to Provide Medical Care and Treatment**

1. **Constitutional Violation**

"Failure to provide adequate medical care is a violation of the Eighth Amendment if it is a result of deliberate indifference to a prisoner's serious medical needs." *Garcia v. Salt Lake*

*Cty.*, 768 F.2d 303, 307 (10th Cir. 1985) (citing *Estelle v. Gamble*, 429 U.S. 97 (1976)). In addition, pretrial detainees are entitled to the same protections under the Fourteenth Amendment due process clause. *See Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009) (citation omitted). To establish a prison official's constitutional liability, a plaintiff must satisfy both the objective and subjective components of the deliberate indifference test. *See generally Sealock v. Colo.*, 218 F.3d 1205, 1209 (10th Cir. 2000).

The objective component requires the plaintiff to produce objective evidence that the deprivation is "sufficiently serious." *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). Defendants each concede, and this court independently concludes, that Plaintiffs satisfy the objective component of the deliberate indifference test. *See* [#114 at 9; #116 at 14]. *See also*, *Martinez*, 563 F.3d at 1088–89 (acknowledging that death, "without doubt," constitutes a sufficiently serious harm).

The subjective component requires the plaintiff to produce evidence of the defendant's culpable state of mind, *i.e.*, to establish that the defendant(s) knew the plaintiff faced a substantial risk of harm, yet disregarded that risk. *Estelle*, 429 U.S. at 106; *Oxendine v. Kaplan*, 241 F.3d 1272, 1276 (10th Cir. 2001) (quotations and citation omitted). To satisfy this element, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. Deliberate indifference requires more than mere negligence." *Sealock*, 218 F.3d at 1211; *Estate of Martinez v. Taylor*, 176 F. Supp. 3d 1217, 1227 (D. Colo. 2016) (comparing the subjective component to recklessness in criminal law, where, to act recklessly, a person must "consciously disregard a substantial risk of serious harm."). Whether the defendant(s) had the requisite knowledge of a substantial risk of serious harm may be inferred from circumstantial evidence, which may be

satisfied upon a showing that the serious medical need was "obvious." *See DeSpain v. Uphoff*, 264 F.3d 965, 975 (10th Cir. 2001) (quotations and citations omitted).

Here, Defendants argue that they are entitled to qualified immunity because there is no genuine issue of material fact that they subjectively understood the serious medical risk faced by Mr. Dixon, yet disregarded it. Defendants Butler, Clark, and Morlock contend that they each believed Mr. Dixon to be highly intoxicated, as Mr. Dixon had watery and bloodshot eyes, was confused, slurred his speech, was unsteady on his feet, and could not complete the four administered sobriety tests. *See, e.g.*, [#114 at SOUMF ¶¶ 5–7; #116 at SOF ¶¶ 4, 11–12; #123 at SOF ¶¶ 11–12; #123 at SOF ¶¶ 19, 21, 25; #123-3 at 12:16–23:17 (Defendant Butler testifying to Mr. Dixon's issues completing the sobriety tests), 84:7–9; #123-12 at 81:19–21]. Defendants Butler and Morlock also testified that Mr. Dixon smelled of alcohol and had admitted to consuming beer earlier in the day, *see* [#123-12 at 95:2–7, 97:5–6; #123-3 at 91:8–13], and Defendants Clark and Butler testified that they discovered an unopened six-pack in the back of Mr. Dixon's vehicle, *see generally* [#123-3 at 87:3–8]. Further, these Defendants contend that Mr. Dixon did not request medical assistance and that there is no evidence to suggest that these Defendants disregarded the risk that Mr. Dixon would die due to bacterial pneumonia.[7] [#114; #116]. However, the court respectfully disagrees, and concludes that the record reflects genuine issues of material fact as to these issues, and others.

After reviewing the record, the court finds at least the following material facts regarding a constitutional violation disputed:

---

[7] *But see Layton v. Bd. of Cty. Com'rs of Oklahoma Cty.*, 512 F. App'x 861, 870 (10th Cir. 2013) (holding, "[t]o survive summary judgment, Appellants did not need to provide evidence that 'on April 28, 2009, Mr. Holdstock faced death.' Instead, Appellants merely needed to present evidence that Mr. Holdstock faced a substantial risk of serious harm of which the prison officials were, or should have been, aware.").

1. Whether Defendant Butler was aware that Mr. Dixon was ill and had defecated in his pants at the time of the traffic stop. *Compare* [#123-12 at 60:3–8, 90:3–11, 92:11–15] *with* [#123-3 at 78:14–18];

2. Whether Mr. Dixon's physical and mental impairments were consistent with intoxication, given that he informed Defendants Clark, Morlock, and Butler that he was sick. *See, e.g.*, [#123-15 at 3; #123-17 at 5; #123-19 at 10, 12];

3. Whether Mr. Dixon's request that Defendant Butler roll down the window in his police vehicle, because Mr. Dixon was "burning up" was the result of Mr. Dixon having a fever or being overly dressed for the weather. *Compare* [#116 at SOF ¶¶ 21–22] *with* [#123 at ¶ 27];

4. Whether Mr. Dixon actually smelled of alcohol at the time of the traffic stop, or whether Mr. Dixon's odors were consistent with his illness. *See* [#123-3 at 37:17–39:15; #123-13 at 35–36; #123-15 at 2–3; #123-17 at 4–5; #123-19 at 12];

5. Whether Mr. Dixon's vehicle contained an unopened six-pack of beer at the time of the traffic stop. *Compare* [#116-3 at 61:9–62:23] *with* [#123-3 at 40:8–11, 42:3–5]; *see also* [#123-13 at 23, 27, 29; #123-19 at 6].

6. Whether Defendant Jacobs followed jail protocol and medically screened Mr. Dixon prior to his booking. *See* [#123 at SOF ¶ 36; #123-1 at 70:7–71:5; #123-4 at 145:8–15];

7. Whether, at the time of Mr. Dixon's booking, Defendants Clark, Morlock, and Butler knew that Mr. Dixon suffered from a serious medical condition and the reasons that Mr. Dixon was not provided any medical treatment. *See* [#123-1 at 43:11–18; #123-4 at 79:15–80:20; #123-12 at 143:20–144:6, 147:9–18, 153:10–11; #123-13 at 19; #123-15 at 3]; and

8. Whether Defendants Butler, Clark, and Morlock suspected and/or knew Mr. Dixon suffered from pneumonia given their respective interactions with Mr. Dixon, the fact that Mr. Dixon

appeared to have a bad cold or the flu, and the multiple observations that Mr. Dixon appeared to have "crackling lungs" and breathed like his "throat needed to be cleared." *See* [#114-9 at 76:19–77:18; #123 at SOF ¶ 47; #123-4 at 51:10–19; #123-11 at 70:8–19, 73:2–5, 74:24–75:3; #123-13 at 4, 29, 44–45; #123-15 at 3, 5].

Thus, the court respectfully concludes that a genuine issue of material fact exists as to Defendants Morlock, Butler, and Clark's subjective understanding and the subsequent adequacy of their actions. *See Marquez v. Bd. of Cty. Com'rs of Eddy Cty.*, 543 F. App'x 803, 805–06 (10th Cir. 2013) (holding, "given all the overt signs that Mr. Marquez had a serious medical problem, a jury could reasonably conclude that the Defendants were aware of but indifferent to a serious medical risk."); *cf. Berry v. City of Muskogee, Okl.*, 900 F.2d 1489, 1498 (10th Cir. 1990) (explaining that deliberate indifference can be satisfied if the "risk was so substantial or pervasive that knowledge can be inferred") (citations omitted).

## 2. Clearly Established

Despite the court's conclusion above, for Plaintiffs to survive summary judgment they must also demonstrate that Defendants Clark, Butler, and Morlock violated Mr. Dixon's *clearly-established* rights. "For a constitutional right to be clearly established, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Wilson v. Montano*, 715 F.3d 847, 852 (10th Cir. 2013) (internal quotations, brackets, and citation omitted). Plaintiffs may do so "by identifying an on-point Supreme Court or published Tenth Circuit decision; alternatively, 'the clearly established weight of authority from other courts must have found the law to be as the plaintiff[s] maintain[].'" *Quinn v. Young*, 780 F.3d 998, 1005 (10th Cir. 2015) (quoting *Weise v. Casper*, 593 F.3d 1163, 1167 (10th Cir. 2010)).

Here, Defendants argue that Plaintiffs cannot demonstrate a violation of clearly established law. *See* [#114 at 12; #116 at 19]. Specifically, Defendants argue that Plaintiffs cannot satisfy their burden unless they point to an opinion, "finding that a law enforcement officer violates the Fourteenth Amendment by failing to provide medical care to a detainee exhibiting symptoms similar to [Mr.] Dixon, where the detainee declined medical care and died from an undiagnosed pulmonary infection only six hours after initial contact." [#116 at 19]. However, this reading of the law is too narrow. Under the prevailing case law of the United States Court of Appeals for the Tenth Circuit ("Tenth Circuit"), a plaintiff need not point to case law on factual all-fours when the defendant's conduct is "obviously egregious . . . in light of prevailing constitutional principles;" rather, it is enough to demonstrate that the unlawfulness is apparent. *A.M. v. Holmes*, 830 F.3d 1123, 1135–36 (10th Cir. 2016). In other words, Plaintiffs "need not show that the very action in question has previously been held unlawful" if the unlawfulness is apparent under pre-existing law. *Id.* (internal quotations, brackets, ellipses, and citation omitted). In fact, the Tenth Circuit has made clear that a defendant can still be on notice that her conduct violates established law even in novel factual circumstances. *Casey v. City of Fed. Heights*, 509 F.3d 1278, 1284 (10th Cir. 2007).

Plaintiffs, however, fail to address the clearly-established prong of the qualified immunity analysis in their response. [#123]. Rather, Plaintiffs argue solely that genuine disputes of material fact exist as to whether Defendants Clark, Butler, and Morlock were deliberately indifferent to Mr. Dixon's serious medical needs. *See* [*id.* at 30 (citing *Marquez*, 543 F. App'x at 807)].[8] Even construing Plaintiffs' response as generally arguing that a

---

[8] In citing the applicable summary judgment standard, Plaintiffs rely upon this court's decision in *J. Lee Browning Belize Trust v. Aspen Mountain Condominium Ass'n, Inc.*, 2017 WL 62212, at *2 (D. Colo. Feb. 15, 2017). That case, however, was not a § 1983 action and, therefore, the

detainee's rights to adequate medical assistance were clearly established, the Supreme Court has again reminded lower federal courts that "'clearly established law' should not be defined 'at a high level of generality.'" *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (quoting *Ashcroft v. al– Kidd*, 563 U.S. 731, 742 (2011)); *accord Cox*, 800 F.3d at 1245–46 ("However, Ms. Cox made no more than an anemic attempt to carry this burden as to the clearly-established-law question, merely asserting in bare-bones fashion that Mr. Jernegan's constitutional 'right to adequate medical care and to be free from deliberate indifference ha[d] been clearly established for decades.' . . . As a consequence, Ms. Cox did little to aid the district court in its resolution of this question and perhaps contributed to the confusion evident in the district court's misguided qualified-immunity analysis."). While Plaintiffs are not required to cite to law that precisely mirrors the particular circumstances of Mr. Dixon's case, it is Plaintiffs' burden to establish more than a generalized principle of constitutional law. *See Toler v. Troutt*, 631 F. App'x 545, 547 (10th Cir. 2015) (reversing the district court's denial of qualified immunity; noting, "[i]n stating that deliberate indifference to an inmate's medical needs is a clearly established constitutional violation . . . the district court's parameters were overly broad. If such a general statement of the constitutional violation that must be clearly established were sufficient, qualified immunity would almost never be granted."). It cannot be assumed nor constructed by the court. Indeed, even when a party is proceeding *pro se*, a court may not assume the role of an advocate for that party, nor should it supply legal theories or construct arguments on a party's behalf. *See Whitney v. New Mexico*, 113 F.3d 1170, 1173–74 (10th Cir. 1997) (observing that it is inappropriate for a court to act as an advocate for a *pro se* litigant). In this case, Plaintiffs have been represented by

---

legal standard articulated did not address a plaintiff's burden in responding to the invocation of qualified immunity by an individual defendant at summary judgment.

counsel since the inception of the lawsuit through summary judgment, and the court cannot infer arguments where none have been made.

Consequently, despite the troubling circumstances giving rise to this action, the absence of any argument as to whether Mr. Dixon's constitutional rights were clearly established necessitates a conclusion that Plaintiffs' have failed to carry their burden to overcome the invocation of qualified immunity by Defendants Clark, Butler, and Morlock. Accordingly, their Motions for Summary Judgment are **GRANTED** as to Claim II.

### B.     Claims III and IV – *Monell* Liability

As discussed, municipalities cannot be held liable under § 1983 under a theory of respondeat superior; instead, a local government is liable only when the "the unconstitutional actions of an employee were representative of an official policy or custom of the municipal institution, or were carried out by an official with final policy making authority with respect to the challenged action." *Seamons v. Snow*, 206 F.3d 1021, 1029 (10th Cir. 2000). Plaintiffs can demonstrate a policy or custom by identifying: "(1) a formal regulation or policy statement;" (2) an informal custom that is widespread and well-settled so as to constitute law; (3) the decisions of employees with final policymaking authority; (4) the final policymakers delegation and ratification of their subordinates' decisions; or (5) "the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused." *Bryson v. City of Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010) (internal quotations, brackets, and citations omitted). The County and CCSO move for summary

judgment on Claims III and IV because Plaintiffs fail to support either claim with competent evidence. [#114 at 16]. For the following reasons, the court respectfully agrees.[9]

### 1. Claim III

As to Claim III, the County and CCSO argue that Plaintiffs fail to identify an unconstitutional policy that was the "moving force" behind the alleged constitutional violation. [#114 at 17]. Rather, Plaintiffs argue that the CCSO has unconstitutional policies of not providing medical care to detainees in need; however, the basis of Plaintiffs' alleged constitutional violation was the CCSO and its employees' failure to follow jail policies. [*Id.*]. Plaintiffs respond that, despite any policies regarding the medical care of detainees, "there is a systemic failure within the County/CCSO in implementing those policies, a total lack of proper training and supervision, which was the 'moving force' behind the constitutional violations." [#123 at 31]. Plaintiffs continue that the jail's "gross deficiencies" of medical preparedness, *i.e.*, lack of any medical clinic, medical staff, or proper medical equipment for the evaluation and treatment of detainees, constitutes a policy or custom of deliberate indifference to a detainee's right to adequate medical care. *See* [*id.* at 32 (quoting *Garcia*, 768 F.2d at 307)]. For the following reasons, the court respectfully disagrees.

In *Garcia*, the Tenth Circuit held that Salt Lake County's informal policy of admitting unconscious detainees to the jail and its procedures for monitoring such inmates constituted deliberate indifference to serious medical needs. 768 F.2d at 308 (concluding that the County's

---

[9] Because the court's grant of summary judgment as to Defendants Clark, Butler, and Morlock rests upon the basis that Plaintiffs failed to carry their burden of establishing that the alleged constitutional violation was clearly established once qualified immunity was invoked, "there is nothing anomalous about allowing a suit against a municipality to proceed when immunity shields the [individual] defendants," for the court's finding did not rest upon a determination that no constitutional violation occurred. *Wilson v. Meeks*, 98 F.3d 1247, 1255 (10th Cir. 1996) (citing *Hinton v. City of Elwood, Kan.*, 997 F.2d 774, 782 (10th Cir.1993)).

staffing and monitoring procedures were "gross deficiencies"). Specifically, the jail housed as many as 400 inmates at a time, but only had a physician on site three days a week for two hours, a nurse four to five hours five days a week, and a medical technician daily from 5:00 a.m. to 9:00 p.m. *Id.* Conversely, the Crowley County Jail houses approximately twelve (12) inmates at a time, *see* [#123-4 at 113:17–19], and Mr. Dixon's case does not involve the admittance of an unconscious inmate. *See Montoya v. Newman*, 115 F. Supp. 3d 1263, 1283 (D. Colo. 2015) (holding that the jail's failure to have formally trained medical personnel on site was not a policy that presented an obvious risk to inmate health, especially because the jail housed approximately 32 inmates at a time); *see also Martinez*, 563 F.3d at 1092 (distinguishing *Garcia* because the defendants did not have a policy of admitting unconscious inmates).

Further, it is undisputed that Mr. Dixon arrived at the jail conscious and able to comprehend the booking process, that the jail has a policy for medically screening detainees, that the jail has a first aid kit and portable defibrillators, and that jail personnel either call for an ambulance or personally transport seriously injured or ill detainees to the AVRMC which is approximately 30-minutes from the jail. *See e.g.*, [#114 at SOUMF ¶¶ 20–23; #116 at SOF ¶ 32; #123-4 at 110:1–116:25; #132-1 at 41:7–22 (Deputy Coroner Gibson testifying that there are no doctors in Crowley County, only a nurse practitioner)]. However, the evidence does not support an inference that the County or CCSO perceived a risk to inmate health and safety by failing to have medically trained personnel on site at the jail, but consciously disregarded that risk.[10] *See Montoya*, 115 F. Supp. 3d at 1283; *see also Olsen*, 312 F.3d at 1318 (noting that municipality liability depends on whether "the municipality has actual or constructive notice that its action or

---

[10] In passing, Plaintiffs also appear to support Claim III by arguing that the County abdicated its statutory responsibilities to inspect the jail at least once a year pursuant to Colo. Rev. Stat. § 17-26-136. *See* [#123 at SOF ¶ 56; *id.* at 32]. However, the Colorado General Assembly repealed the provision cited by Plaintiffs in 1996.

failure is substantially certain to result in a constitutional violation, and it consciously and deliberately chooses to disregard the risk of harm," or if the violation of federal rights is a "highly predictable or plainly obvious consequence of a municipality's action." (internal quotations and citations omitted)). Accordingly, the County Defendants' Motion for Summary Judgment is **GRANTED** as to Claim III.

### 2. Claim IV

As to Claim IV, Plaintiffs may establish a policy or custom by the County and CCSO's (including Defendant Clark) failure to adequately train or supervise its employees, so long as that failure results from deliberate indifference to the injuries that may be caused. *See Bryson*, 627 F.3d at 788. However, it is not enough for Plaintiffs to point to a single violation of federal rights—they must prove that the County and CCSO "failed to train its employees to handle recurring situations presenting obvious potential for such a violation." *Allen v. Muskogee*, 119 F.3d 837, 841–42 (10th Cir. 1997).

The County and CCSO move for summary judgment on Claim IV because Plaintiffs fail to proffer any evidence, other than a single incident, to establish that the Defendants systematically failed to train jail staff on how to medically care for detainees. [#114 at 17; #132 at 9–10]. Plaintiffs respond that Mr. Dixon's case is not merely evidence of a single incident, as no Defendant or jail personnel that he encountered provided adequate medical treatment. [#123 at 31]. Plaintiffs maintain that this constitutes a systemic problem, not just a single incident. [*Id.*]. However, it is undisputed that the jail has had only one similar incident, *i.e.*, the death of a detainee, since 1912. *See* [#114 at SOUMF ¶ 33; #114-11 at 132:7–11]. Moreover, "[a] plaintiff cannot rely only on her individual treatment to establish a policy or custom, even if she is treated on multiple days by different defendants. . . . a single incident of a constitutional violation is

insufficient to prove a policy or custom even when the incident involved several employees of the municipality." *Keele v. Glynn Cty., Ga.*, 938 F. Supp. 2d 1270, 1289 (S.D. Ga. 2013) (internal quotations and citations omitted). Accordingly, the County Defendants' Motion for Summary Judgment is **GRANTED** as to Claim IV.

### C. Claim V - Failure to Train and Supervise

To prevail on a failure to train and supervise claim under § 1983, a plaintiff must demonstrate an "affirmative link" between the supervisor-defendant and the constitutional violation—the supervisor's "mere knowledge" of his employee's conduct is insufficient. *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 767 (10th Cir. 2013) (citing *Iqbal*, 556 U.S. at 677). Accordingly, a plaintiff must establish: (1) the defendant's personal involvement; (2) a causal connection; and (3) a culpable state of mind. *See Dodds v. Richardson*, 614 F.3d 1185, 1195 (10th Cir. 2010). Again, "[§] 1983 does not authorize liability under a theory of respondeat superior." *Brown v. Montoya*, 662 F.3d 1152, 1164 (10th Cir. 2011).

The County Defendants move for summary judgment on Claim V because Defendant Morlock did not supervise jail personnel, nor did he "intentionally disregard[] his duty to train and supervise deputies 'to evaluate serious medical conditions.'" [#114 at 13–14 (quoting [#67 at ¶ 100])]. Plaintiff does not respond to Defendant Morlock's arguments. While the FAC contains conclusory assertions that Defendants Clark and Morlock failed to train their employees on how to "recognize and appropriately respond" to the serious medical needs of detainees and those encountered during a traffic stop, *see* [#67 at ¶¶ 99–106], at summary judgment, Plaintiffs are required to come forward with more than simply unverified allegations contained in their operative complaint. However, summary judgment is not warranted merely because the

nonmovant failed to respond—the movant must still demonstrate that no genuine issue of material fact exists. *See Reed v. Bennett*, 312 F.3d 1190, 1195 (10th Cir. 2002). Nonetheless, the court concludes that the County Defendants met their burden as to Claim V.

First, it is undisputed that Captain Leah Fox (a non-party), not Defendant Morlock, had supervisory authority over jail dispatchers and booking deputies, and that Captain Fox promulgated the jail's procedures for medically screening detainees. *See* [#114 at SOUMF ¶¶ 31–32; #123 at SOF ¶ 55 (stating that Defendant Clark was responsible for all patrol and jail policies of the CCSO, and directed Captain Fox to draft those policies); #123-4 at 125:7–16; #123-12 at 223:2–14]. Further, Captain Fox reported directly to Defendant Clark. [#123-12 at 223:10–14]. Thus, it is undisputed that Defendant Morlock was not personally involved in the failure to train jail personnel on recognizing and responding to detainees' serious medical needs. *See Pahls v. Thomas*, 718 F.3d 1210, 1226, 1232 (10th Cir. 2013) (explaining that personal involvement requires a showing that the defendant was responsible for continuing an unconstitutional policy) (citation omitted).

Next, regarding Defendant Morlock's failure to train deputies to recognize and respond to the serious medical needs of persons encountered during a traffic stop, the court concludes that Plaintiffs fail to demonstrate an affirmative link between Defendant Morlock's conduct and the alleged constitutional violation. *See Schneider*, 717 F.3d at 767. As mentioned, the FAC contains only conclusory allegations that Defendant Morlock failed to adequately train his employees. *See* [#67 at ¶¶ 100, 102–103]. Moreover, it is undisputed that Defendant Morlock summoned Defendant Butler to the traffic stop because Defendant Butler had advanced SFST from the state of Colorado, and that all deputies must receive Peace Officer Standards and

Training ("POST")[11] and pass the POST certification examination prior to becoming a law enforcement officer in Colorado. *See* [#114 at SOUMF ¶¶ 9, 47]. And, as discussed *supra*, Plaintiffs reliance on this single incident, without more, fails to create a triable issue of fact as to whether Defendant Morlock failed to train his subordinates to handle "recurring situations presenting an obvious potential for such a violation." *See Allen*, 119 F.3d at 842. Consequently, the County Defendants' Motion for Summary Judgment is **GRANTED** as to Claim V.

## II.     Claims VI and VII - State Law Claims:  Colo. Rev. Stat. § 13-21-202

In addition to federal law claims, Plaintiffs bring two state law negligence claims under Colorado's Wrongful Death Statute against all Defendants. [#67 at 23–26]. The court has discretion to decline to exercise supplemental jurisdiction over Plaintiffs' state law claims. *Wittner v. Banner Health*, 720 F.3d 770, 781 (10th Cir. 2013). This is particularly true when, as here, the claims constituting the basis of this court's subject matter jurisdiction have been dismissed, leaving only the state law claims. *See Tal v. Hogan*, 453 F.3d 1244, 1270–71 (10th Cir. 2006) (noting that it is well within the district court's discretion under 28 U.S.C. § 1367(c)(3) to decline to exercise supplemental jurisdiction over the plaintiff's state-law claims after dismissing her federal claims); *Schonebaum v. Shellpoint Mortg. Servicing*, No. 14-CV-03093-REB-KLM, 2016 WL 1104875, at *11 (D. Colo. Feb. 29, 2016) (declining to exercise supplemental jurisdiction over the plaintiff's state-law claims once the court dismissed plaintiff's federal claims). Accordingly, the court declines to exercise supplemental jurisdiction over Plaintiffs' state-law claims, and **DISMISSES without prejudice** Claims VI and VII.

---

[11] The state of Colorado requires all peace officers to be certified by the POST Board. *See* Colorado Peace Officer Standards and Training, *available at https://coloradopost.gov/certification/basic-certification* (last visited Apr. 10, 2017).

## CONCLUSION

For the reasons stated herein, **IT IS ORDERED** that:

(1) The County Defendants' Motions for Summary Judgment [#114] is **GRANTED IN PART and DENIED IN PART**, and judgment be entered in their favor as to Claims II, III, IV, and V;

(2) The Individual Defendants' Motion for Summary Judgment [#116] is **GRANTED IN PART and DENIED IN PART**, and judgment be entered in favor of Defendants Miles Clark, Mark Morlock, and James Butler as to Claim II;

(3) Plaintiffs' state-law claims, Claim VI and VII, are **DISMISSED without prejudice**;

(4) Each party will bear its own costs and fees;[12]

(5) The Motions Hearing set for **April 25, 2017, at 10:00 a.m.** is **VACATED**; and

(6) All further settings, including but not limited to the Trial Preparation Conference set for **September 19, 2017, at 10:00 a.m.** and the Jury Trial set to begin on **September 25, 2017, at 8:30 a.m.** are **VACATED**.

DATED: April 18, 2017                          BY THE COURT:

                                             s/ Nina Y. Wang
                                             United States Magistrate Judge

---

[12] While costs should generally "be allowed to the prevailing party," Fed. R. Civ. P. 54(d)(1), the district court may in its discretion decline to award costs where a "valid reason" exists for the decision. *See, e.g., In re Williams Securities Litigation-WCG Subclass*, 558 F.3d 1144, (10th Cir. 2009) (citations omitted). Given that the court finds the evidence sufficient to create a genuine issue of material fact as to whether Defendants violated Mr. Dixon's constitutional rights, and the novel circumstances of this matter, the court declines to impose costs. *See Cantrell v. Int'l Bhd. of Elec. Workers, AFL-CIO, Local 2021*, 69 F.3d 456, 459 (10th Cir. 1995) (noting that there is no abuse of discretion when the district court denies fees where the "issues are close and difficult," or where the prevailing party is only partially successful).